* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing in a Pre-Trial Agreement dated February 28, 2002, as:
 STIPULATIONS
1. The Employee is Louise H. Phillips.
2. The Employer is Angelo's Shoes, Inc.
3. The employer was insured at all relevant times.
4. The carrier is Casualty Reciprocal Exchange and the adjusting agency is James C. Greene Company, Inc. *Page 3 
5. At the time of the accident, Angelo's Shoes regularly employed three or more employees and was bound by the North Carolina Workers' Compensation Act.
6. An employer-employee relationship existed between defendant-employer and plaintiff on or about February 8, 1992, the date of injury.
7. Plaintiff's average weekly wage was $547.67 and plaintiff's compensation rate is therefore $365.11 per week.
8. On April 13, 1994, the North Carolina Industrial Commission determined that plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer on February 8, 1992.
9. Defendants have paid plaintiff compensation for temporary total disability at the rate of $365.11 per week from February 9, 1992, through June 30, 1993, and from May 23, 1994, through the present and continuing.
10. At the hearing on March 6, 2002, the following exhibits were stipulated into evidence:
 a. Stipulated Pre-Trial Agreement (Revised).
 b. Stipulated Medical Records.
 c. All IC Forms contained in the IC file.
 d. All documents contained in Industrial Commission file.
 e. Photographs and/or and a videotape offered by plaintiff illustrating his need for attendant care.
 * * * * * * * * * * *
An Opinion and Award was previously entered in this matter by Deputy Commissioner Morgan Chapman on April 13, 1994, and, as an Award of the Commission, is incorporated *Page 4 
herein by reference. In addition, Forms 26 dated September 6, 1995, and February 14, 1996, were approved by the Commission and are incorporated herein by reference.
 * * * * * * * * * * * EVIDENTIARY RULING
The motion by plaintiff to admit the transcript of the testimony previously taken by the Commission in 1994 is ALLOWED inasmuch as the parties were identical, defendants were represented by competent counsel, and the issues then are relevant to the issues before the Commission now.
Deputy Commissioner Dollar erred in allowing the admission of evidence obtained eight months after the initial hearing before her and after ten depositions had already been taken. However, in the discretion of the Full Commission, the motion of the defendants to be allowed to offer videotapes and testimony from a private investigator is ALLOWED.
 * * * * * * * * * * * ISSUES
The issues for determination presented by the parties to the Full Commission at this time are as follows:
1. Whether plaintiff remains totally disabled by her partial paraplegia and the complications thereof such that she is permanently and totally disabled absent a substantial change of her condition for the better;
2. What amount of attendant care plaintiff requires;
3. What amount of compensation, if any, plaintiff is entitled to for past attendant care provided by her daughter; *Page 5 
4. Whether a permanent membership at the pool for aquatic therapy would afford plaintiff relief from her pain resulting from her compensable injury by accident;
5. Whether plaintiff's physician, Dr. Samuel Bowen, is entitled to payment for his treatment of plaintiff;
6. What penalty, if any, is appropriate for the defendant carrier's failure to pay Dr. Bowen for the past 12 months;
7. Whether defendants have established by a preponderance of the credible evidence that plaintiff has enjoyed a substantial improvement in her condition such that placement activities proposed by defendant-carrier appear reasonably likely to result in placement of the injured worker in suitable employment, and that vocational activities are not futile in light of plaintiff's near decade of total disability, neurogenic bladder secondary to her partial paraplegia as a result of her compensable injury by accident, somewhat advanced age of 57 (D.O.B. 4-21-47), limited education (through ninth grade), limited work experience (she was a shoe salesperson for 20+ years), chronic pain, and the absence of any proof that her physical and/or psychiatric condition has substantially improved; and,
8. What amount, if any, plaintiff or her attorney is entitled to be reimbursed by defendants for the Life Care plan prepared by Barbara Armstrong.
 * * * * * * * * * * * *Page 6 
Based on the foregoing stipulations and the credible, competent evidence contained in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the date of the most recent Deputy Commissioner hearing, plaintiff was 54 years old, her date of birth being April 21, 1947. She is a native of Catawba County, North Carolina, and has lived and worked in the Hickory area all of her life.
2. Plaintiff ended her formal schooling with the 9th grade, but completed her GED in 1989 prior to her work-related injury on February 8, 1992. The results of vocational testing administered by Vocational Expert Randy Adams on March 27, 2001, indicate that plaintiff's reading skills are at a high school level, her spelling skills are at a 7th grade level, and her arithmetic skills are at a 6th grade level.
3. Plaintiff had been employed by Angelo's Shoes for approximately 20 years as a saleswoman at the time of her February 1992 injury. Her job duties included selling shoes, receiving stock, checking special orders, setting up displays, and managing the store when Mr. Emanuel, the owner, was away. Plaintiff's average weekly wage was $547.67.
4. Although poorly educated, plaintiff acquired significant skills in the fitting of shoes, especially for children. She was known throughout the Hickory area as being particularly patient with children and adept at meeting their needs for fitting shoes properly.
5. Prior to her injuries, plaintiff was well-groomed and skilled at dealing with the public.
6. Prior to her on-the-job injury of February 8, 1992, plaintiff was an excellent employee, according to her employer's testimony at the initial hearing. *Page 7 
7. On February 8, 1992, plaintiff suffered a compensable injury when she lifted the second of two TV's from the floor to a shelf in the store. This resulted in an incomplete thoracic paraplegia at the level of T10-T12. She was subsequently treated by Dr. Charles Branch and Dr. Andrea Stutesman, and underwent physical therapy at North Carolina Baptist Hospital after being discharged from treatment.
8. Although vigorously contested by defendant carrier, plaintiff's claim for benefits was allowed by Deputy Commissioner Chapman on April 13, 1994. In Finding of Fact Number 5 of her Opinion and Award, Deputy Commissioner Chapman found (and defendants did not appeal) the following:
 On February 8, 1992, plaintiff sustained an injury by accident arising out of and in the course of her employment. The fact that she lifted a television constituted a specific traumatic incident of the work assigned. The Brown-Sequard Syndrome of the spine, which she was subsequently treated for, was a proximate result of this specific traumatic incident.
9. From the outset, plaintiff's injury has been difficult for the doctors to label. However, the fact that she has a spinal cord injury variously described as Brown-Sequard Syndrome or incomplete thoracic paraplegia, and the fact that her spinal cord injury is compensable, areres judicata.
10. As a result of her spinal cord injury, plaintiff has a neurogenic bladder that has consistently required treatment and medication. On June 6, 1994, Plaintiff was seen by Dr. Mark Anderson upon referral by Dr. Stutesman for a neurogenic bladder that had resulted from her spinal cord injury. This condition has been treated with medicine and an intermittent catheterization program, and she has gone from a bi-annual to a yearly renal ultrasound to help manage this problem. She now has to wear adult Depends, and still has "accidents" which *Page 8 
require her to keep a change of clothes with her. Plaintiff's neurogenic bladder requires her to have ready access to a bathroom.
11. Plaintiff was referred by Dr. Stutesman to a psychologist, Dr. D. Scott Cutting, for evaluation and subsequent treatment. She first saw him on November 14, 1994. On December 6, 1994, Dr. Cutting wrote in a letter to the insurance adjuster, Nancy Jones, that it was his opinion that "Plaintiff is remarkably free of significant anxiety or depression." However, plaintiff's psychological condition has deteriorated since that time.
12. Because of her concern over plaintiff's seriously depressed state, Dr. Stutesman referred her to Susan Indenbaum at Health Psychology Resources for an evaluation. Ms. Indenbaum saw her on January 30, 1995, and noted that plaintiff seemed "to cycle in and out of short periods of depression, but denies any significant symptoms at this time." The main focus of the session was plaintiff's anger related to "other people `telling her how she feels and what she needs to be doing.'" Plaintiff did not return to Ms. Indenbaum for any more sessions as she already was seeing Dr. Cutting on a regular basis.
13. Plaintiff underwent an evaluation on July 21, 1995 with T. Kern Carlton at The Rehab Center. He noted that plaintiff "does have objective evidence of a significant spinal cord injury and reports complaints of chronic severe pain." Due to these findings and her extensive treatments and efforts at rehabilitation, he noted, "I do not believe she is a candidate for competitive employment." He gave her an impairment rating of 25% of the back.
14. Although she was initially upbeat about her prospects for recovery, plaintiff has become discouraged and depressed as a result of her chronic pain and ongoing disability.
15. Plaintiff has had persistent difficulty sleeping since her injury by accident. *Page 9 
16. As found by Deputy Commissioner Chapman, plaintiff reached maximum medical improvement from a neurological perspective on June 30, 1993.
17. Since the prior awards of the Commission, plaintiff's physical and psychological conditions have deteriorated.
18. In November 2000, Dr. Stutesman took a leave of absence and referred plaintiff to Dr. Samuel T. Bowen at Bowen Urgent Care for her new primary care doctor. Plaintiff first saw him on December 4, 2000.
19. Plaintiff continues to be seen regularly by Dr. Samuel T. Bowen for her primary care and medications. Dr. Cutting at Burke Rehabilitation Center manages her psychological care, and she sees Dr. Anderson for her neurogenic bladder. Because of the complexity of her incomplete thoracic paraplegia and the fragility of plaintiff's psychological condition, it is particularly important that her care be managed by physicians whom she trusts.
20. As a result of her compensable spinal cord injury and the complications thereof, plaintiff takes or has taken the following medications: Oxycontin for pain, Oxy IR for breakthrough pain, Topamax for muscle spasms, Remeron for depression, Wellbutrin for depression, Prozac for depression, Ditropan for bladder control, Pericolace for bowel regularity, Valium for muscle spasms, Lioresal for muscle spasms, Darvocet for pain, Skelaxin for muscle-spasms, Baclofen for muscle spasms, and Zanaflex for muscle spasms. In addition, plaintiff uses a muscle simulator.
21. Plaintiff was sexually abused as a child. Defense witness Dr. Terence Fitzgerald, a clinical health psychologist, testified that Plaintiff's "history was compelling, and I think it was characterized certainly by non-family of origin sexual abuse beginning at age six or seven and terminating at age 11." He concluded that because of her early learning history, she was at an *Page 10 
increased risk for somatic issues. When addressing his assessment of plaintiff's depression, Dr. Fitzgerald explained that plaintiff had a "pre-existing tendency to put her stress into her physical symptoms, and that comes, based on the research, in my opinion, from her early learning history." He further stated that "the conversion of psychosocial stress into physical complaints" is known as "somatization," a "rather normal tendency" which "can be grossly skewed in somebody who has certain types of early learning history in terms of physical abuse, sexual abuse."
22. When she was about fifteen, plaintiff was in a severe automobile accident as a result of which she remained unconscious and hospitalized for an extended period of time.
23. Defendants sent plaintiff for an independent medical evaluation by Dr. James Hoski on September 6, 2000. However, while Dr. Hoski had been supplied by the defendants with some of plaintiff's medical records, he testified at his deposition that he did not have plaintiff's prior medical studies to review. He also did not remember how much time he actually spent with plaintiff the single time he evaluated her. Dr. Hoski's evaluation was therefore brief, limited by incomplete records review, and is not persuasive.
24. Plaintiff was seen on June 4, 2001, by Dr. Otis Delano Curling, a neurosurgeon at Winston Neurological and Spinal Surgery Associates, for another "independent medical examination." Dr. Curling stated that, based upon his examination, "she has indeed experienced an upper motor neuron injury, consistent with mid thoracic spinal cord injury."
25. On November 28, 2001, at the request of defendant-carrier, plaintiff was seen by Dr. Terence Fitzgerald, a clinical health psychologist, for an "Independent Psychological Evaluation/Risk Factor Screen." Upon completion, Dr. Fitzgerald noted: "I find clear psychological barriers to participation in vocational rehabilitation." He felt that her medical *Page 11 
treatment had been appropriate and "that she is at maximum psychological improvement for her work-related injury."
26. At the initial hearing, when asked about plaintiff's reliability and honesty, her employer of some twenty years, Angelo Emmanuel, testified: "I could always depend [on her]. I could be six thousand miles away, I knew she would be there . . . I found her very honest."
27. Dr. Fitzgerald interviewed plaintiff and did a psychological assessment of her, which included the administration of the MMPI-2 (Minnesota Multiphasic Personality Inventory — Version 2). He stated at the March 6, 2002, hearing that "the truthfulness of this individual'sreport was never in doubt. This was a good validity profile." (Emphasis added)
28. Dr. Fitzgerald testified that plaintiff "was over-reporting her current distress, not so much in an attempt to fake bad in myprofessional opinion, but as a plea for help, which is just a way that, in my opinion, she was trying to make it clear to me, as the reader of this and interpreter, that she felt she was in some turmoil. Sometimes people do that." (Emphasis added) He repeated his belief that her "so-called over-reporting" of certain symptoms "doesn't mean that she's faking bad. It just means she's over-reporting some of her distress measures."
29. Dr. Cutting, the psychologist who knew plaintiff when she was the "Shoe Lady" of the Hickory area and who has seen her since November 14, 1994, testified that plaintiff had never really accepted her disability and that she felt rage and hopelessness as a result. For whatever reason, Dr. Cutting explained that plaintiff now becomes uncontrollably angry when frustrated by interactions with others.
30. After plaintiff's claim was determined to be compensable in the Opinion and Award of April 13, 1994, (more than 2 years after her on-the-job injury and her last date of *Page 12 
work), and defendants began paying for medical care, plaintiff returned to Dr. Stutesman and Dr. Anthony Wheeler for additional treatment.
31. Plaintiff commuted to Charlotte for physical therapy and treatment for chronic pain from July 25 to July 29, 1994, at Rehab Advantage at the Charlotte Institute of Rehabilitation under the direction of Dr. Wheeler.
32. Dr. W. Michael Nesbit at Charlotte Institute of Rehabilitation estimated on June 15, 1994, that when plaintiff completed the rehabilitation program there that she would be at maximum medical improvement and have a permanent partial impairment of 20%.
33. Dr. Wheeler saw plaintiff last on July 29, 1994, when he rated plaintiff with a 10% permanent partial disability to the back. He noted: "This rating is entirely based on the patient's back pain and does not take into account her neurological status or bladder involvement."
34. Dr. Stutesman rated plaintiff with a 27 % permanent partial impairment to her back and felt that she had reached maximum medical improvement on August 24, 1994.
35. On July 21, 1995, Dr. Carlton assigned plaintiff an impairment rating of 25% to the back.
36. When plaintiff was seen on June 4, 2001, by Dr. Curling, who saw plaintiff at the request of the defendants when Dr. Branch would not see plaintiff, Dr. Curling also reviewed plaintiff's medical records. Dr. Curling found that plaintiff had reached maximum medical improvement and retained a 50% impairment to the whole body as a result of her spinal cord injury. *Page 13 
37. As a result of her spinal cord injury by accident on February 8, 1992, plaintiff retains a 27% permanent partial impairment of her spine and a 50% impairment of the whole person.
38. Plaintiff underwent a functional capacity evaluation (FCE) at Pro Active Therapy of Hickory, Inc., on January 28, 1994. Her work was restricted to sedentary with limitations of sitting and standing after 20 minutes.
39. On July 29, 1994, Dr. Wheeler released plaintiff to attempt to return to work full-time, but restricted her to sedentary work.
40. Dr. Stutesman noted on January 9, 1995, that plaintiff "feels strongly that she is not able to work." Dr. Stutesman noted poor balance, abnormal sensation, and an abnormal gait that put her at risk for falls, as well as the urinary urgency, all of which are problems that will need to be considered with any job. Dr. Stutesman stated: "Consistent 40 hour a week employment will be difficult to find given her restrictions and pain level."
41. When Dr. Carlton examined plaintiff at The Rehab Center in Charlotte on July 21, 1995, he noted "objective evidence of a significant spinal cord injury and reports complaints of chronic severe pain," and opined: "Due to these findings [of significant spinal cord injury and chronic severe pain] and her extensive treatments and efforts at rehabilitation, I do not believe she is a candidate for competitive employment."
42. At his independent medical examination of plaintiff on June 4, 2001, Dr. Curling also noted in his addendum of June 9, 2001, that her ability to return to productive work activities would be severely restricted by her impairments and restricted to some sedentary activities. This he clarified with restrictions of "negligible lifting, no prolonged station more *Page 14 
than 30 minutes, frequent changes in positions as needed and minimal bending" after a gradual return.
43. At his deposition on May 22, 2002, Dr. Hoski testified: "Unless she has an automobile that has hand controls, she should not be driving a car. She should have a wheelchair for long distances. It doesn't have to be motorized. . . . She would need Canadian forearm crutches that go along the arms."
44. In the opinion of her longtime treating psychologist, Dr. Cutting, as a result of her spinal cord injury and the resulting psychological problems, plaintiff is psychologically unable to tolerate vocational rehabilitation activities.
45. Upon completion of his November 28, 2001, evaluation of plaintiff at defendant-carrier's request, Dr. Fitzgerald noted: "I find clear psychological barriers to participation in vocational rehabilitation."
46. Based upon the opinions of Drs. Fitzgerald and Cutting, the Full Commission finds as fact that plaintiff is unable to tolerate vocational rehabilitation activities.
47. Plaintiff attempted vocational rehabilitation at the direction of defendants. As noted upon her referral to the Charlotte Institute of Rehabilitation on June 15, 1994, plaintiff had been in a sheltered workshop prior to her referral to Charlotte to see if she could get to a higher level of functioning. She completed the program at the Charlotte Institute on August 2, 1994. Plaintiff was described as "a pleasant and co-operative lady who attempted all activities requested of her." It was felt at that time that plaintiff had some "potential" for returning to work.
48. Thereafter, it was determined that Angelo's Shoes did not have work available within plaintiff's restrictions. *Page 15 
49. Subsequently, guided by several vocational counselors employed by defendant-carrier, plaintiff attempted work hardening at a sheltered workshop and applied for work at a number of different employers. These efforts were ultimately unsuccessful and the vocational file was closed on December 29, 1994.
50. After defendants terminated efforts at vocational rehabilitation in 1994, more than 6 1/2 years went by before defendants again commenced vocational activities.
51. On March 27, 2001, plaintiff met with Randy Adams, a vocational expert. Considering her physical and psychological problems, her limited education, and other pre-existing conditions, it was his opinion, and the Full Commission finds as fact, that plaintiff is permanently and totally disabled from any competitive employment.
52. In June 2001, defendants assigned Frank Radford, case manager, to facilitate vocational rehabilitation and medical care. At that time, plaintiff had been out of work for over nine years, was in chronic pain, depressed, had developed a neurogenic bladder, and had been through numerous rehabilitation centers and physical therapy with very little change in her condition. Mr. Radford began his efforts at returning her to employment by setting up appointments for plaintiff with his brother-in-law, Roy Sumpter, a vocational rehabilitation specialist.
53. Plaintiff underwent an FCE at Pro Active Therapy of Hickory, Inc., on January 28, 1994. Her work level was determined to be sedentary with limitations of sitting and standing after 20 minutes. Her gait was noted as "unsafe and unsteady," and she used a cane for assistance because she reported that her legs spontaneously gave out on her.
54. On January 9, 1995, Dr. Stutesman noted poor balance, abnormal sensation, and an abnormal gait that put her at risk for falls. *Page 16 
55. Since her injury, Plaintiff has also fallen numerous times due to her abnormal gait and loss of balance. A number of falls requiring medical treatment are documented in her medical reports. On February 27, 1992, Robin Essler, PT, of Rehabilitation Center noted that plaintiff reported "she fell down twice yesterday." Dr. Robert Liljeberg treated her for an injury to her left elbow resulting from a fall on September 21, 1997. X-rays taken at Frye Regional Medical Center revealed a non-displaced radial head fracture. Later at Catawba Memorial Hospital, plaintiff had x-rays taken of her left leg and knee due to a fall on September 30, 2000. Dr. Peter Hurley also treated her on October 11, 2000, for a left lower leg and knee injury from a fall on the stairs when her muscles gave way. Plaintiff was treated again at Catawba Memorial Hospital on March 16, 2002, for an eye injury from another fall, which led to further treatment for an eye injury at Viewmont Eye, Ear, Nose and Throat Associates.
56. Plaintiff is at constant risk of falling and injuring herself further as a result of her incomplete thoracic paraplegia resulting from her work-related injury of February 8, 1992.
57. Plaintiff owns two houses. One is a small home in Hickory where she resided with her parents at the time of this injury. Since plaintiff was injured on the job on February 8, 1992, and rendered a partial paraplegic, her mother has died and her father has gone to a nursing home.
58. The second house that plaintiff owns is located in the Conley Springs area of Burke County just west of Hickory. This house is very old and is not habitable and is used for storage. Plaintiff's daughter, Angie, and her two sons, with whom plaintiff stays most of the time, have a two bedroom trailer located next to the old house used for storage. *Page 17 
59. As indicated by Plaintiff's Exhibit 2, the daughter's trailer where plaintiff resides most of the time lacks guardrails. She would benefit from the installation of appropriate guardrails.
60. Because of plaintiff's incomplete thoracic paraplegia and the resulting numbness, chronic and severe leg pain, and her loss of balance, plaintiff requires handicapped accessible housing to reduce the risk of further injury due to falling.
61. Plaintiff's depression and other psychological problems caused by or aggravated by her on the job injury are permanently and totally disabling.
62. On August 24, 1994, Dr. Stutesman noted: "She will need ongoing medical care as any other incomplete paraplegic would." This should include care for the neurogenic bladder.
63. Dr. Cutting has provided psychological services to plaintiff. Because of her ongoing depression and occasional suicidal ideation, plaintiff requires ongoing psychological treatment.
64. Due to her partial paraplegia, plaintiff suffers from limited muscle control, such that she has fallen often and has had to be taken to the hospital and even undergo further physical therapy. Therefore, she finds it difficult to maintain many daily chores and activities without attendant care in the confines of her home as well as outside of her home.
65. In 1995, Barbara Armstrong, RN, CDMS, CCM, and CLCP prepared a Life Care Plan, updated in 2002, for plaintiff. Ms. Armstrong testified that the items plaintiff would need included the following: medical supplies (pads, Depends); a cane, replaced every three years; orthotic shoes, replaced annually; an AFO brace, replaced every three years; hand controls for driving; a bench-tub chair in the shower; a motorized scooter; and a standard wheelchair. Ms. Armstrong also testified that plaintiff would need handicapped access to her home in two *Page 18 
different ways, and a safe and stable floor. Finally, Ms. Armstrong testified that as for attendant care, plaintiff needs a person to help with custodial tasks, heavy housecleaning, home maintenance, lifting, and yard work. Ms. Armstrong estimated that approximately four hours of custodial care per week would be sufficient. However, she anticipated that Plaintiff would require further attendant care as she ages.
66. Because of the severity of plaintiff's injury and the complexity of her incomplete thoracic paraplegia, the life care plans prepared by Ms. Armstrong were medically necessary to assist the parties in understanding plaintiff's needs.
67. As set out in the life care plans of Ms. Armstrong, plaintiff requires past, present, and future attendant care.
68. Dr. Hoski's testimony supports plaintiff's need for some attendant care to assist her with certain activities of daily living.
69. On November 19, 2002, counsel for defendant-carrier e-mailed and sent by first class mail a letter requesting an opportunity to reopen the record of evidence and offer "additional evidence pertaining to the plaintiff's activity since the date of the hearing in this case" based on a "new report from Roy Sumpter," the vocational rehabilitation specialist assigned to plaintiff by Frank Radford, plaintiff's case manager. The motion was silent as to any evidence obtained by Rick Hinson, a private investigator doing surveillance on the plaintiff. According to the letter motion to Deputy Commissioner Dollar, the report of Mr. Sumpter was important because it allegedly established that plaintiff was able "to have a discussion with two acquaintances without urinating or defecating on herself."
70. The evidence offered by defendants included the following report from Mr. Sumpter: *Page 19 
 On Thursday, November 7, 2002, I was having lunch with a business associate in an Asheville, NC restaurant. I had just been seated when I noticed two ladies being seated at a table near me. One of the ladies looked familiar. A few minutes later a third person joined them. It was Louise Phillips. I observed Ms. Phillips for almost one hour and a half.
 Ms. Phillips' mobility and demeanor were in sharp contrast to previous observations. When I first met with Ms. Phillips at her attorney's office, she quickly informed me that she was "incontinent" and had to use the restroom very frequently. She also told me of her pain and that she could sit for only short periods of time and then needed to lie down (which she did during that initial interview). She was using a cane and stated that she needed it to steady herself when walking.
 When I met Ms. Phillips for her interview at the Econo Force Industrial complex, she arrived looking very disheveled. She reminded me of her constant pain, the difficulties she has in walking, and of her problem with incontinence. As we walked to the interview room, Ms. Phillips relied heavily upon her cane and walked with a very unsteady gait. As we turned a corner, Ms. Phillips fell to the floor and requested help in standing. She continued on to the interview room. At the beginning of the interview, Ms. Phillips spoke of her pain and her inability to concentrate for any period of time, her inability to move about without great difficulty, and her need to use a restroom every ten to fifteen minutes.
 Ms. Phillips appeared at the restaurant to be well groomed and was neatly dressed. She proceeded to the table without any assistance from either a cane or another person. (She did have a slight limp.) Her gait was steady and she appeared to navigate without difficulty. There was no apparent staggering or loss of balance. These same characteristics were observed the one time Ms. Phillips got up from the table and headed toward the restrooms and when she returned a few minutes later. Overall, Ms. Phillips ate and engaged in conversation over a period of approximately ninety minutes with no outward signs of discomfort.
71. On cross-examination of Mr. Sumpter, it was developed that Mr. Sumpter had never recorded any of the contrasting earlier observations in his vocational rehabilitation reports. In short, the Full Commission finds that Mr. Sumpter's report of his November 7, 2002, *Page 20 
observation of plaintiff are not probative of any intentional deceit on the part of plaintiff. Additionally, Mr. Sumpter violated Rule V.F.1 of the North Carolina Industrial Commission Rules for Utilization of Rehabilitation Professionals in Workers' Compensation Claims, which states, under "Prohibited Conduct," that "RPs shall not conduct or assist any party in claims negotiation, investigative activities, or perform any other non-rehabilitation activity."
72. Defendants also introduced three surveillance reports dated November 7, 2001, November 24, 2002, and December 15, 2002, as well as videotapes taken from September 27, 2001, through December 11, 2002. On September 27, 2001, the surveillance began at 10 a.m. and ended at 2:15 p.m., a total of 4.25 hours. During that period a friend drove plaintiff to a doctor's appointment, plaintiff drove herself to a drive-through restaurant, and plaintiff exhibited a noticeable limp with the use of a cane. On November 19, 2002, the private investigator observed plaintiff at Performance Motors and while making errands to State Farm Insurance Company. On November 21, 2002, the investigator observed plaintiff driving her car, running errands, and arriving at Performance Motors. On that occasion she was limping noticeably. On December 3, 2002, plaintiff was observed going to her doctor, using her cane and having a noticeable limp. On December 11, 2002, plaintiff was observed at Performance Motors walking with a noticeable limp. She arrived at Performance Motors at 9:11 a.m. and left at 10:40 a.m. The total hours of surveillance was 73 hours; the total activity observed during the 73 hours was 8.15 hours. There was no indication that plaintiff realized that she was under surveillance.
73. At the hearing of this matter before the Deputy Commissioner on March 6, 2002, plaintiff testified that she has good days and bad days. She indicated that on a "good day" she is able to get out of the house to eat, either alone or with friends, and that she may visit her doctor or run an errand or two without limping as badly as she does on other days. The additional *Page 21 
evidence offered by defendants essentially corroborated her testimony. The testimony from Mr. Sumpter and private investigator Rick Hinson establishes that plaintiff can, on a good day, go out to eat with friends, or go visit her doctor, or run an errand or two without limping as badly as she does on other days. Defendants' surveillance also supports plaintiff's hearing testimony that there are bad days when she does not go out at all.
74. The Full Commission finds, based on the evidence of record, that plaintiff has failed to present sufficient evidence to support a finding that aquatic therapy effects a cure, gives relief, or may lessen the period of plaintiff's disability.
 * * * * * * * * * * *
Based upon the forgoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On February 8, 1992, plaintiff sustained a compensable spinal cord injury by accident to her back resulting in a condition variously described as Brown-Sequard Syndrome or incomplete paraplegia from the nipple line down. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has been entitled to and has been paid total disability benefits of $365.11 per week from February 9, 1992, up to the present. N.C. Gen. Stat. § 97-29.
3. As a result of plaintiff's injury by accident on February 8, 1992, and the muscle spasticity, neurogenic bladder, balance and gait problems, chronic pain, and depression resulting therefrom, plaintiff will require continuing monitoring and medical care in order to effect a cure, give relief, or lessen plaintiffs period of disability. N.C. Gen. Stat. § 97-25; Little v. Penn Ventilator, 317 N.C. 206, 345 S.E.2d 204
(1986); Hyler v. G.T.E. Products Co., 333 N.C. 258, 425 S.E.2d 698
(1993). *Page 22 
4. Because of the severity of plaintiff's injury and the complexity of her incomplete thoracic paraplegia, the Life Care Plans prepared by Barbara Armstrong were medically necessary to assist the parties in understanding plaintiff's needs. Timmons v. N.C. Department ofTransportation, 351 N.C. 177, 522 S.E.2d 62 (1999).
5. Because of her incomplete thoracic paraplegia and the resulting numbness, chronic and severe leg pain, and her loss of balance, plaintiff requires handicapped accessible housing to reduce the risk of further injury due to falling. Timmons v. N.C. Department ofTransportation, 123 N.C. App. 456, 473 S.E.2d 356 (1996), aff'd. percuriam, 346 N.C. 173, 484 S.E. 2d 551 (1997).
6. As a result of the stipulated injury by accident on February 8, 1992, plaintiff has a permanent injury to her bladder, which is an important organ or part of plaintiff's body for which no compensation is payable within any other subdivision of N.C. Gen. Stat. § 97-31, equitable compensation for which is $20,000.00. N.C. Gen. Stat.97-31(24).
7. As a result of her stipulated injury by accident on February 8, 1992, plaintiff retains a 27% permanent partial impairment of her spine and a 50% impairment of the whole person. N.C. Gen. Stat. § 97-29.
8. As a result of her 1992 stipulated injury by accident and the incomplete thoracic paraplegia and other problems plaintiff sustained therefrom, plaintiff has been and is totally disabled. Absent a substantial improvement in her condition, plaintiff is permanently and totally disabled. N.C. Gen. Stat. § 97-29.
9. Although pursuant to N.C. Gen. Stat. § 97-31 plaintiff is entitled to compensation for her 27% permanent impairment to the spine plaintiff suffered in the 1992 injury by accident, as well as compensation for injuries to the bowel and bladder, important parts of the body, her *Page 23 
more favorable remedy is benefits under N.C. Gen. Stat. § 97-29. Plaintiff is entitled to compensation for permanent total disability in the amount of $365.11 per week for the rest of her life absent a change in her condition and subject to the attorney fee below. N.C. Gen. Stat. § 97-29.
10. Plaintiff is entitled to have all of her medical expenses incurred or to be incurred as a result of her injuries by accident, including the services rendered by Dr. Samuel T. Bowen, which are causally related to plaintiff's injury by accident on February 8, 1992, paid for by defendants for so long as these treatments effect a cure, give relief, or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19) and97-25; Little v. Penn Ventilator Co., 317 N.C. 206 (1986).
11. Absent a substantial change in the employee's condition, the totality of the evidence demonstrates that further efforts at vocational rehabilitation would not be reasonably likely to result in placement of the injured worker in suitable employment but, instead, would only cause plaintiff additional suffering and would waste the parties' time and defendants' money. North Carolina Industrial Commission Rules for Utilization of Rehabilitation Professionals in Workers' Compensation Claims, Rule VIII; Peoples v. Cone Mills, 316 N.C. 426, 342 S.E.2d 798
(1986).
12. Plaintiff suffered a greater degree of incapacity for work than the same injury might cause another person with superior education, work experience, or a younger age due to the pre-existing conditions of plaintiff's advancing years (she is now 58), her limited education (9th grade plus a GED), her limited work experience (she worked exclusively in the shoe sales business for 20 years prior to her injury), and as a result of her spinal cord injury and related conditions (the chronic severe back and leg pain, sleep loss, the loss of bowel and bladder *Page 24 
control, and depression). N.C. Gen. Stat. § 97-29; Hilliard v. ApexCabinet Company, 305 N.C. 593, 290 S.E.2d 682 (1982).
13. Plaintiff is not psychologically able to comply with vocational rehabilitation as sought by the defendants. Johnson v. Jones Group,Inc., 123 N.C. App. 219,472 S.E. 2d 587 (1996).
14. Defendant-carrier's effort to compel plaintiff to engage in vocational rehabilitation is misdirected and is therefore denied based on the totality of the evidence, including plaintiff's age, education, and work experience, and lack of transferable skills; the severity of plaintiff's spinal cord injury, and the physical and psychological restrictions imposed thereby; the prior unsuccessful efforts that were made to return plaintiff to work, and the length of time that plaintiff has been out of work; the length of time that no vocational efforts were made; and the absence of any persuasive evidence indicating that placement activities would be reasonably likely to result in suitable employment that plaintiff is capable of obtaining and retaining. Absent a substantial improvement in her condition, plaintiff shall not be required to participate in vocational rehabilitation. North Carolina Industrial Commission Rules for Utilization of Rehabilitation Professionals in Workers' Compensation Claims, Rule VIII.G.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Although pursuant to N.C. Gen. Stat. § 97-31, plaintiff is entitled to compensation for her 27% permanent impairment to the spine plaintiff suffered in the 1992 injury by accident, as well as compensation for injuries to the bowel and bladder, important parts of the body, *Page 25 
her more favorable remedy is benefits under N.C. Gen. Stat. § 97-29. Therefore, subject to the attorney's fee approved herein, defendants shall pay plaintiff compensation for permanent total disability in the amount of $365.11 per week for the remainder of her life absent a substantial change in her condition.
2. A reasonable attorney's fee of 25% is approved for plaintiff's counsel (who has already received 25% of the weekly total disability benefits paid from the date of the accident to date). Such amount shall be deducted from the sum due plaintiff, and paid directly to plaintiff's counsel.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of her injuries by accident, including the expenses for services rendered by Dr. Samuel T. Bowen, which are causally related to plaintiff's injury by accident on February 8, 1992, and the consequences thereof, as by law provided.
4. Defendants shall reimburse plaintiff for 4 hours per week of attendant care necessary to accommodate the needs of plaintiff for daily function and maintenance of her home and personal care in the amount of $7.00 per hour, or an otherwise reasonable standard rate based upon plaintiff's geographic location.
5. Defendants shall reimburse plaintiff's attorney for the Life Care Plans prepared by Barbara Armstrong in the amount of $2,798.77.
6. Defendants shall not be obligated to pay for a permanent pool membership for aquatic therapy, as plaintiff has failed to demonstrate that such treatment affords plaintiff relief from pain resulting from her compensable injury by accident. *Page 26 
7. The Full Commission does not reach the issue of theextent of defendants' obligation to provide handicapped-accessible housing to plaintiff, as that issue was not presented by the parties before Deputy Commissioner Dollar.
8. Defendants shall pay the costs, including an expert witness fee of $175.00 to Dr. Bowen; an expert witness fee of $400.00 to Dr. Curling; an expert witness fee of $275.00 to Dr. Cutting; an expert witness fee of $275.00 to Dr. Fitzgerald; an expert witness fee of $500.00 to Dr. Hoski; an expert witness fee of $275.00 to Dr. Stutesman; an expert witness fee of $240.00 to Dr. Tananis; an expert witness fee of $150.00 to vocational expert Roy Sumpter; and an expert witness fee of $445.00 to vocational expert Randy Adams. In addition, defendants shall pay an expert witness fee of $810.00 to Life Care Planner Barbara Armstrong, if they have not already done so.
9. Defendants shall pay the costs.
This 28th day of February, 2007.
S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/ ______________________ PAMELA T. YOUNG COMMISSIONER
 S/ ______________________ DANNY L. MCDONALD COMMISSIONER *Page 1